**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| MINNESOTA DEER FARMERS ASSOCIATION, et al., | Civil No. 23-3907 (JRT/LIB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| SARAH STROMMEN, *in her official capacity as Commissioner of the Minnesota Department of Natural Resources*, et al., | |
| Defendants. | |

Erick G. Kaardal and Gregory M. Erickson, **MOHRMAN, KAARDAL & ERICKSON**, **P.A.**, 150 South Fifth Street, Suite 3100, Minneapolis, MN 55402, for Plaintiffs.

Philip Pulitzer, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, Saint Paul, MN 55101, for Defendants.

In 2023, the Minnesota legislature passed legislation intended to combat the spread of Chronic Wasting Disease ("CWD"), an illness found in white-tailed deer that is incurable, fatal, and potentially transmissible to humans. The legislation, among other changes, increases regulatory oversight of white-tail deer farms and vests that oversight with the Minnesota Department of Natural Resources ("DNR"), requires the farmers to erect fences to prevent exposure to wild deer, restricts the transfer of white-tail deer farm registrations, and prohibits the issuance of new white-tail deer farm registrations.

The Minnesota Deer Farmers Association, a Minnesota nonprofit corporation that advocates on behalf of deer farmers, and the deer farmers themselves (collectively "Plaintiffs"), brought this action against DNR Commissioner Strommen and several Minnesota Board of Animal Health ("BAH") board members in their official capacities (collectively "Defendants"), claiming that the legislation violates their due process and equal protection rights under the Fourteenth Amendment and their Fifth Amendment right to be free from unconstitutional property seizures. Plaintiffs also request a preliminary injunction enjoining enforcement of Minnesota Statute § 35.155, subdivision 10(c), and the additional exclusionary fencing requirements.

The State enacted § 35.155 to address CWD, a growing health concern that experts say could develop into a public health crisis if left unmanaged, which is certainly a legitimate state interest that passes rational-basis review. Plaintiffs thus fail to plead a cognizable claim under the Due Process Clause or the Equal Protection Clause. Plaintiffs Fifth Amendment Takings Clause claim also fails as a matter of law. Accordingly, the Court will grant Defendants' Motion to Dismiss and will deny Plaintiffs' Motion for Preliminary Injunction as moot.

## BACKGROUND

White-tail deer are part of the farmed Cervidae family, which also include mule deer, red deer, elk, moose, caribou, and sika. (Am. Compl. ("Compl.") ¶ 217, Feb. 12, 2024, Docket No. 12.) Cervidae are susceptible to CWD, an incurable, infectious,

neurological disease of the Cervidae family.[1]  If a Cervidae, like a white-tailed deer, is

infected with CWD, the animal's brain cells deteriorate to a spongy consistency, causing

the animal to eventually die.  (Compl. ¶¶ 215, 220–21; Mem. Supp. Mot. Prelim. Inj. at 5,

Feb. 23, 2024, Docket No. 20.)

Although CWD has previously been considered only a threat to Cervidae, studies

have recently opined that it may be transmissible to humans.[2]  Due to this concern and

the disease's spread throughout the United States, including into Minnesota, the State

passed Minnesota Laws 2023, Chapter 60, Article 7, Sections 1–14 (codified at Minn. Stat.

§ 35.155) to contain and stop the transmission of CWD.[3]  (Compl. ¶¶ 218–19, 222.)

Minnesota has historically regulated the white-tail deer farming industry heavily.

Section 35.155 continues to tighten regulations, largely due to the Minnesota

Department of Natural Resources 2022 Legislative Report ("Report"), which identified

farmed Cervidae as a major culprit in introducing CWD to Minnesota.[4]  The Report also

noted the hefty cost of CWD surveillance and regulatory oversight of deer farms.[5]  As a

---

[1] Minnesota Dep't of Nat. Res., *Report: Concurrent Authority Regulating Farmed White-tailed Deer* 5 (Feb. 1, 2022), https://files.dnr.state.mn.us/aboutdnr/reports/legislative/2022/concurrent-authority-legislative-report-farmed-deer.pdf.

[2] *Chronic Wasting Disease*, CDC (Apr. 17, 2024), https://www.cdc.gov/chronic-wasting. The Court will take judicial notice of CWD's exposure risks, as detailed on the CDC's website.  Fed. R. Evid. 201(c)(1); *see Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (recognizing authority to take judicial notice of government websites).

[3] Minnesota Dep't of Nat. Res., *supra* note 1 at 5.

[4] *Id.* at 2–3.

[5] *Id.* at 6 (noting that the State spent $55,176 on CWD testing in farmed Cervidae and $2.9 million on CWD activities for wild deer).

result of their findings, the DNR and BAH recommended greater regulation of deer farms and heightened fencing requirements.[6]  The Minnesota Legislature heeded the agencies' recommendations, introducing new and amending existing farmed Cervidae regulations. *See* Minn. Stat. § 35.155.  The subdivisions at issue include:

**Subdivision 4** details fencing requirements for Farmed Cervidae.

**Subdivision 10** requires a registration to possess Cervidae, prohibits the State from issuing new registrations to possess white-tailed deer, and limits current registration holders to a one-time transfer to an immediate family member.

**Subdivision 11(d)(3)**, upon CWD detection, requires maintaining a fence on the premises for ten years.

**Subdivision 11(d)(5)** prohibits raising farmed Cervidae on the premises for ten years upon CWD detection.

**Subdivisions 11(d)(6)**, upon CWD detection, requires disclosing to a property buyer the date of herd depopulation and the requirements incumbent upon the premises.

**Subdivision 11(d)(7)**, upon CWD detection, mandates recording with the applicable county recorder "the date of detection, the date of depopulation, the landowner requirements under this paragraph, and any other information

---

[6] *Id.* at 7–8.

required by the board . . . The notice expires and has no effect ten years after the date of detection stated in the notice."

Minn. Stat. § 35.155 subds. 4, 10–11.

While Defendant Commissioner Strommen leads the DNR and is charged with overseeing, enforcing, and implementing Minnesota Statute § 35.155, the Commissioner may contract with the BAH to administer such provisions.  *See* Minn. Stat. § 35.155 subd. 15(a).

Plaintiffs allege that (1) § 35.155, subd. 10(c) violates their substantive due process rights under the Fourteenth Amendment because it deprives Plaintiffs of their fundamental right to pursue a common calling as white-tailed deer farmers; (2) § 35.155, subd. 10(c) violates their right to equal protection under the Fourteenth Amendment by advantaging those with immediate family over those without and by treating deer farmers more stringently than other livestock farmers; (3) § 35.155, subds. 4, 10, and 11 violate the Takings Clause of the Fifth Amendment; and (4) the DNR's additional fencing requirement violates due process protection because it was implemented without any rule-making process.  (Compl. ¶¶ 229–329.)  Additionally, Plaintiffs seek injunctive relief against the enforcement of Minnesota Statute § 35.155 subdivision 10(c).  (*Id.* pp. 63–64.)

## DISCUSSION

### I.      MOTION TO DISMISS

#### A.      Standard of review

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the Complaint as true to determine if the Complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   The Court construes the Complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).   Although the Court accepts the Complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted).   Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

At the motion to dismiss stage, the Court may consider the allegations in the Complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).   The Court may also consider matters of public record and exhibits attached to the pleadings, so long as those

documents do not conflict with the Complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

**B.   Analysis**

**1.      Substantive Due Process (Count II)**

Minnesota Statute § 35.155 imposes increased regulations on white-tail deer farms, thus increasing costs and hoops for deer farmers to jump through.  For instance, subdivision 10(c) prohibits the State from issuing new farming registrations, meaning there can be no new entrants into the industry.  The Plaintiffs argue that § 35.155's various provisions, especially subdivision 10(c),[7] deprives them of their fundamental right to pursue a common calling as white-tailed deer farmers and should be struck down under strict scrutiny.  Plaintiffs cite *Conn v. Gabbert*, in which the Supreme Court stated that "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment." 526 U.S. 286, 291–92 (1999).  *But see id.* (clarifying that right "is nevertheless subject to reasonable government regulation").  Defendants disagree and move to dismiss this claim because there is no fundamental right to farm deer.

---

[7] This argument applies to Mr. Udovich, the only Plaintiff without a valid registration who wishes to enter the white-tail deer farming profession in Minnesota.  (Compl. ¶¶ 170–71.)

### a. The liberty to pursue one's chosen occupation is not a fundamental right.

To plead a cognizable substantive due process claim, among other things, a plaintiff must plead a violation of a fundamental right. *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017). "For purposes of substantive due process analysis, fundamental rights are those 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005)).

Plaintiffs do not claim that they have a fundamental right to farm, nor could they. *See United States v. Plume*, 447 F.3d 1067, 1075 (8th Cir. 2006) ("The Supreme Court has not declared 'farming' to be a fundamental right, and we decline to do so today."). Rather, Plaintiffs claim that they have a fundamental right to pursue their occupation as a white-tail deer farmer.

The Supreme Court has recognized that there is a general liberty interest to pursue a particular calling or occupation. *Conn*, 526 U.S. at 291–92; *see also Robbins v. Becker*, 794 F.3d 988, 994 (8th Cir. 2015); *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008). However, "[t]he fact that a right is acknowledged to be a liberty covered by the Due Process Clause does not automatically render that right 'fundamental' such that any statutory regulation of that right must be subjected to the highest constitutional scrutiny." *Rogers*, 139 F. Supp. 3d at 157. Accordingly, this Court and others have

declined to extend due process protections to one's ability to engage in their occupation or profession. *See Telescope Media Grp. v. Lindsey*, 271 F. Supp. 3d 1090, 1127–28 (D. Minn. 2017), *aff'd in part, rev'd in part on other grounds, and remanded sub nom. Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019); *Doe v. Rogers*, 139 F.Supp.3d 120, 156 & n.23 (D.D.C. 2015) (noting that "numerous federal circuit courts have concluded that the right to engage in a chosen profession is not a fundamental right" and collecting cases); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 47–48 (D.D.C. 2018) (rejecting plaintiff's claim that the challenged state regulation deprived them of their fundamental right to work as self-employed taxicab drivers).

Indeed, neither the Supreme Court nor the Eighth Circuit have recognized that there is a fundamental right to work or operate a business free from disfavored regulations. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955) ("The day is gone when [courts] use[ ] the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."); *Singleton v. Cecil*, 176 F.3d 419, 429 (8th Cir. 1999) (declining to consider "occupational liberty [as] sufficiently fundamental to qualify for substantive due process protection"). The Court will therefore not expand the reach of substantive due process to these facts. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (noting the Supreme Court's reluctance to expand substantive due process protections because it "place[s] the matter

outside the arena of public debate and legislative action"); *Albright v. Oliver*, 510 U.S. 266, 271–72 (1994) (same).

To hold otherwise would lead to absurd results. For instance, lead paint, asbestos, and ethylene oxide are banned because of their negative impact on public health. (Reply Mot. Dismiss at 2–3, Mar. 28, 2024, Docket No. 30.) But under Plaintiffs' theory, an individual who operates or works for a company that manufactures such substances would be constitutionally entitled to carry on their dangerous activities. Likewise, physicians who wish to practice physician-assisted suicide could feasibly argue that they have been deprived of their ability to pursue their occupation despite Supreme Court precedent upholding state bans on such activities. *See Glucksberg*, 521 U.S. at 735. In sum, under Plaintiffs' theory, essentially any legislation regulating a profession or occupation would be subject to strict scrutiny. Such a result "would be the equivalent of neutering the regulatory power of state government." *See Kafka v. Hagener*, 176 F. Supp. 2d 1037, 1043 (D. Mont. 2001) (rejecting the argument that Montana's regulations banning fee killing of game farm animals implicates a fundamental right).

The substantive due process doctrine is "reserved for truly egregious and extraordinary cases," which this is not. *Myers v. Scott County*, 868 F.2d 1017, 1018 (8th Cir. 1989). Moreover, the right to practice one's chosen occupation bears no resemblance to other fundamental liberties, such as the "rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception;

[and] to bodily integrity." *Glucksberg*, 521 U.S. at 720 (citations omitted).  It cannot be that a woman has a constitutionally protected right to farm deer but not to access healthcare. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239–40 (2022).

Because the right to pursue a chosen profession is not fundamental, rational basis applies.

> **b.    Minnesota Statute § 35.155 survives rational-basis review.**

The Court must uphold the law if it is "rationally related to a legitimate state interest." *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020).  The challenged statute is rational so long as there "is any reasonably conceivable state of facts that could provide a rational basis for the classification*." F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

Plaintiffs argue that the statute is not rationally related to the prohibition of new white-tail deer registrations because the "evil" the State seeks to control is CWD, not white-tail deer farmers.  However, the Minnesota legislature passed the statute to prevent the spread of CWD, not to eliminate the white-tail deer farming profession.  The eventual elimination of white-tail deer farming in Minnesota, while unfortunate, is incidental.

Rational basis review does not require the legislature to have chosen the most effective method of achieving its aim, and given the increase in CWD rates, the State could plausibly conclude that prohibiting new white-tail deer farms in Minnesota will effectively curtail the spread of CWD.  *Birchansky*, 955 F.3d at 757 (requiring only "plausible reasons

for the legislature's action" to survive rational-basis review) (cleaned up); *see Spoklie v. Montana*, 411 F.3d 1051, 1059 (9ᵗʰ Cir. 2005) (finding that the state's justifications for passing a law that prohibits operating an alternative livestock ranch without a license and prohibits the issuance of new licenses "far exceed what is necessary to meet" rational-basis review because "Voters who supported [the law] could rationally have concluded that the proposition would . . . prevent transmission of [CWD].").

Thus, because Minnesota Statute § 35.155 rationally relates to Minnesota's legitimate state interest of addressing CWD, it survives rational-basis review. Accordingly, the Court will grant Defendants' Motion to Dismiss as to Count II.

### 2.    Equal Protection (Counts I & III)

As discussed, Minnesota Statute § 35.155, subdivision 10(c) prohibits the issuance of new registrations to farm white-tail deer, and it limits white-tail deer registration holders to a one-time registration transfer to an immediate family member. Plaintiffs argue that this provision makes two classifications that violate their rights: (1) it treats white-tailed deer farmers without immediate family differently than those with immediate family by limiting the one-time registration transfer to immediate family members, and (2) it treats white-tail deer farmers "differently than all other livestock or

poultry owners who may be subject to an infectious disease requiring the eradication of their animals or birds."[8]  (Compl. ¶ 245.)

"The Equal Protection Clause of the Fourteenth Amendment provides that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'"  *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018) (quoting U.S. Const. amend. XIV, § 1).  "The Equal Protection Clause demands that similarly situated individuals be treated alike."  *Id.*  "Unless a law burdens a fundamental right, targets a suspect class, or has a disparate impact on a protected class and was motivated by a discriminatory intent, we apply rational basis scrutiny to the challenged law."  *Id.* (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).  "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."  *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993).  Plaintiffs bear the burden of proving "that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational."  *Gilmore v. Cnty. of Douglas*, 406 F.3d 935, 939 (8th Cir. 2005) (quotation omitted).

As the Court concluded, § 35.155 does not burden a fundamental right.  And neither classification is suspect nor quasi-suspect.  *See City of Cleburne v. Cleburne Living*

---

[8] Plaintiffs also claim subdivisions (3) and (7) treat white-tail deer farmers differently than owners of other livestock and poultry.  The Court assumes Plaintiffs intended to cite to subdivisions 11(d)(3) and 11(d)(7), (*see* Compl. ¶¶ 246–50 (citing those provisions, not subdivisions (3) and (7)); however, the distinction does not matter because the Court will conclude all provisions pass rational-basis review.

*Ctr.*, 473 U.S. 432, 440 (1985).  Accordingly, the statute is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *Id.*

Applying rational basis, the State presents "plausible reasons" for the legislature's action.  *Birchansky*, 955 F.3d at 757.  First, under Minnesota Statute § 35.155 subdivision 10(c), current white-tail deer registration holders can transfer their registration to an immediate family member one time.  The State passed this provision to allow one more generation of white-tail deer farming families an opportunity to pursue the profession.  Although this provision may be underinclusive, the State is not required to issue a total ban.  *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1019 (8th Cir. 2012) (upholding an underinclusive ordinance).  And it cannot be said that this "incremental" prohibition is "so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational."  *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 443 (8th Cir. 2007) (quoting *Gilmore*, 406 F.3d at 939).  Ultimately, even if the State could have adopted more effective measures, § 35.155's immediate family member limitation furthers the State's legitimate objective to prevent the spread of CWD by limiting the number of white-tail deer farms.

Second, Plaintiffs argue § 35.155 violates their equal protection rights because it applies only to farmed Cervidae, not to other poultry and livestock owners.  To state an Equal Protection claim, plaintiffs must show that they were "treated differently than

other persons who were 'in all relevant respects similarly situated.'"  *Flowers*, 558 F.3d at

798 (quoting *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994)).  Plaintiffs fail to demonstrate

that they are similarly situated to poultry and livestock farmers.  As Plaintiffs acknowledge

in their complaint, CWD is a transmissible disease that affects **all Cervidae**.  The statute

applies to farmed Cervidae, which includes white-tail deer, mule deer, red deer, elk,

moose, caribou, and sika.  Notably, poultry and other livestock, like cows and chickens,

are not Cervidae and therefore are not impacted by CWD like white-tail deer.[9]  And

Plaintiffs do not argue that white-tail deer farmers are treated differently than any other

Cervidae farmers.  Therefore, Plaintiffs fail to demonstrate that they are similarly situated

to other livestock and poultry farmers because other livestock and poultry are not

susceptible to CWD like white-tail deer and other farmed Cervidae.  Accordingly, the Court

will grant Defendants' Motion to Dismiss as to Counts I and III.

---

[9] Even if, as Plaintiffs argue, a CWD infected wild deer was found on a cattle pasture, the State could rationally conclude that a cattle rancher is not subject to the fencing restrictions, as the animals they raise are not susceptible to CWD.  Additionally, other livestock are less likely to interact with wild deer, which the fencing mandate aims to deter.  Regarding property records, if CWD is detected on an individual's property, the individual "[can]not raise farmed Cervidae on the premises for at least ten years."  *See* Minn. Stat. subd. 11(d)(5).  Thus, subdivision 11(d)(7)'s requirement that the CWD detection be recorded on property records for ten years ensures that future property owners are aware so that they do not farm Cervidae on the premises.  This certainly is rationally related to the State's objective to prevent the spread of CWD by effectuating subdivision 11(d)(5).

### 3.    Takings Clause (Count IV)

Plaintiffs contend that the following provisions of § 35.155 constitute a taking: (1) subdivision 10, which allows the Commissioners to seize and destroy illegally possessed farmed Cervidae; (2) subdivision 10(c), which restrains the alienability of farmed Cervidae; (3) subdivision 11(d)(2), which authorizes the DNR to destroy herds where CWD has been detected; and (4) subdivisions 11(d)(3) and (d)(4), which require Cervidae farmers to erect fencing.  Plaintiffs do not seek money damages for their Takings claim, but rather request injunctive and declaratory relief.  Defendants respond that the Court cannot issue an injunction because the State is immune under the Eleventh Amendment and *Ex Parte Young* does not apply since Plaintiffs have failed to plead a continued violation of federal law.  The Court need not decide whether Defendants are immune, however, because the Supreme Court essentially foreclosed prospective injunctive and declaratory relief for Takings Clause claims in *Knick v. Twp. of Scott*, 588 U.S. 180, 201 (2019).

The Fifth Amendment's Takings Clause prohibits the government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), *overruled on other grounds by Knick*, 588 U.S. at 206.  Only when the government takes private property for public use without just compensation does a Takings Clause claim arise.  *Knick*, 588 U.S. at 189.  If a Plaintiff

succeeds on a Takings Clause claim, the appropriate remedy is just compensation. *Id.* at 201. Injunctive relief is available only if the State does not have an "adequate provision for obtaining just compensation." *Id.*

The State's inverse condemnation statute is generally adequate. Minn. Stat. § 117.045; *see e.g.*, *Am. Fam. Ins.*, 836 F.3d at 924 (rejecting the argument that Minnesota's inverse condemnation procedures are futile). Plaintiffs argue, however, that Minnesota's remedy is inadequate as applied to their case because Minnesota's inverse condemnation procedures would require "a repetitive series of lawsuits involving the same or different parties" with "facts [that] are similar, if not the same." (Mem. Supp. Mot. Prelim. Inj. at 25.) Plaintiffs attempt to analogize the facts here to the facts in *Pharmaceutical Research and Manufacturers of America v. Williams* ("*PhRMA*"), 64 F.4th 932 (8th Cir. 2023). This attempt is misguided.

In *PhRMA*, three insulin manufacturers alleged that a Minnesota law requiring them to give eligible Minnesota residents a 30-day free supply of insulin was a taking. *Id.* at 936–38. The manufacturers argued that Minnesota's inverse condemnation process was inadequate because it required them to seek a "continuous series of state court actions" compelling inverse condemnation proceedings for each of the thousands of insulin units sold. *Id.* at 939. The Eighth Circuit agreed and found Minnesota's inverse condemnation procedures inadequate because it required insulin manufacturers to indefinitely engage in repetitive lawsuits. *Id.* at 945.

-17-

Here, Minnesota's regulatory scheme will not result in the same injured party bringing an action against the same wrongdoer for one wrongful act. *See id.* at 943. Plaintiffs are dozens of white-tail deer farmers who may face different government action over time. And each of the Plaintiffs' potential claims may be different due to the value of the deer. Moreover, it is not certain that the State will even engage in any takings without just compensation. Indeed, Plaintiffs have not alleged that there has been a taking without just compensation to date. And even if there has been, Plaintiffs fail to demonstrate that Minnesota's inverse condemnation statute is inadequate. As the Eighth Circuit acknowledged in *PhRMA*, in most cases the state law's inverse condemnation procedures are adequate. *See id.* at 942. Therefore, Plaintiffs are foreclosed from seeking equitable relief because they may bring an action seeking just compensation if a taking occurs.

To the extent Plaintiffs argue that the general statutory scheme constitutes a regulatory taking of the white-tail deer farming business, such contention is meritless. Under *Penn Central*, a regulation may amount to a taking in light of (1) its economic impact, (2) the extent to which it has interfered with distinct investment-backed expectations, and (3) its character. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). First, the Court presumes that Plaintiffs will indeed incur a large expense by erecting the fence as mandated in subdivision (4); however, expense alone does not establish a regulatory taking. *Id.* at 131 (rejecting the argument that diminution in

-18-

property value, standing alone, constitutes a taking).[10]   Second, Plaintiffs fail to demonstrate the regulation interferes with their investment-backed expectations.  The statute does not prohibit the farmers from selling deer, slaughtering the deer, or otherwise continuing to operate their businesses.  And § 35.155's restriction on the alienation of a registration does not constitute a taking.[11]  *Andrus v. Allard*, 444 U.S. 51, 65–66 ("where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking.").  Moreover, *Penn Central*'s third prong—the character of the government action—considers the health, safety, and general welfare of the public.  *Id.* at 125.  Because the fencing mandate promotes those goals, there is no Takings Clause Claim.  *Id.*

### 4.   Procedural Due Process (Count IV)

Plaintiffs briefly argue that the DNR implemented an additional fencing requirement "without any rule-making process, including any emergency rule-making process, or public comment," in violation of their due process rights.  (Compl. ¶ 319.)

---

[10] Plaintiffs also claim that subdivision 11(d)(7)'s property recording mandate will diminish the value of their property when a sale occurs.  In addition to this claim not being ripe, diminution in property value, standing alone, is not a regulatory taking. *Penn Cent.*, 438 U.S. at 131.

[11] To the extent that Plaintiffs argue that § 35.155's restriction on alienation of deer livestock to non-registered family members is a taking, that argument also fails.  The State may limit the selling of animals to individuals with the necessary registration or licenses. *See Spoklie*, 411 F.3d at 1059 (finding a state law prohibiting the operating of an alternative livestock ranch without a license passes rational-basis review).  Additionally, as the State acknowledged in oral argument, Plaintiffs are permitted to sell their livestock to other registered white-tail deer farmers in the State and to individuals out of state, subject those state's applicable laws.

Plaintiffs reference the DNR's website and claim that the website states several new fencing requirements.  (Mem. Supp. Mot. Prelim. Inj. at 10.)  The website, however, imposes no additional fencing requirements.  Instead, the DNR references Minnesota Statute § 35.155, subdivision 4 and provides a list of examples that satisfy § 35.155's new fencing requirements.  Notably, underneath the examples of compliant fencing, the website states that "this document [does] not have the force and effect of law. This document is informational only and should not be interpreted as creating new criteria or requirements beyond what is already established in the relevant statutes and rules."[12]

Therefore, because Plaintiffs failed to plead a due process violation, the Court will grant Defendants' Motion to Dismiss as to Count IV.

## II.   MOTION FOR PRELIMINARY INJUNCTION

Because the Court will grant Defendants' Motion to Dismiss the Amended Complaint in its entirety, the Court will deny as moot the Plaintiffs' Motion for Preliminary Injunction.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

---

[12] *Deer Fencing*, Minnesota Department of Natural Resources, https://www.dnr.state.mn.us/mammals/deer/management/deer-fencing.html (last visited Aug. 12, 2024).

1.   Defendants' Motion to Dismiss Amended Complaint [Docket No. 13] is **GRANTED**;

2.   Plaintiffs' Amended Complaint [Docket No. 12] is **DISMISSED WITH PREJUDICE**; and

3.   Plaintiffs' Motion for Preliminary Injunction [Docket No. 18] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 14, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge